# RICHARD D. MILLET & ASSOCIATES LLC
ATTORNEYS AT LAW

RICHARD D. MILLET
908.595.1212
E-MAIL: *rmillet@milletlaw.com*

KIMBERLY L. RUTLEDGE
908.595.1212
E-MAIL: *krutledge@milletlaw.com*

PLEASE REFER TO
OUR FILE NO.
22642

July 13, 2010

The Honorable William H. Walls
United States District Court, District of New Jersey
Martin Luther King, Jr. Federal Building & Courthouse
50 Walnut Street
Newark, NJ 07102

RE:     Carolyn Balsamides, et al. v. Wal-Mart Stores, Inc., et al.
        Civil Action No. 2:06 cv 5676 (WHW) (CCC)

Dear Judge Walls:

With reference to the above captioned matter, I enclose herewith original of defendant, Wal-Mart Stores, Inc.'s Notice of Motion for Summary Judgment returnable on        , Certification and Brief in Support of Motion and Proposed Order.  Please note that same was already filed with the Court through the ECF system.

I hereby request oral argument on said Motion.

Thank you for your kind attention to the within.

Very truly yours,

Kimberly L. Rutledge

Encl.
Cc. Peter Chamas, Esq. (w/Encl.)
    Sent via email and regular mail

RICHARD D. MILLET & ASSOCIATES LLC

204 EAST MAIN STREET, P.O. BOX 390          PHONE: 908.595.1212 FAX: 908.595.1155
SOMERVILLE, NJ 08876-0390

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---

CAROLYN BALSAMIDES, and her husband,      :
MICHAEL BALSAMIDES

                              :

                Plaintiffs,

VS.                               : CIVIL ACTION NO. 2:06-cv-5676 WHW

WAL-MART STORES, INC.  and /or JOHN DOES :
1-10 (fictitious names, real names unknown);

                             : **JURY TRIAL DEMANDED**

               Defendants.

                             :

---

**DEFENDANT WAL-MART STORES, INC.'S**
**NOTICE OF MOTION FOR SUMMARY JUDGMENT**

TO:    Peter Chamas, Esq.
        Law Office of Gill & Chamas
        655 Florida Grove Road
        P.O. Box 760
        Woodbridge, NJ 07095
        Attorneys for Plaintiff

PLEASE TAKE NOTICE that the undersigned will apply to the above named Court at United States District Court, Martin Luther King, Jr. Federal Building & Courthouse, 50 Walnut Street, Newark, New Jersey, on _____, for an Order granting Summary Judgment in favor of defendant, Wal-Mart Stores, Inc., (more properly designated as Wal-Mart Stores East, LP, hereinafter "Wal-Mart"), and dismissing Plaintiffs' claims under *Fed. R. Civ. P. 56.* A proposed form of Order is attached.

TAKE FURTHER NOTICE that this application is being submitted pursuant to Local Rule 7.1(c), (d), and (e).  A copy of the proposed Order sought is annexed hereto.  Unless you file answering papers or request oral argument, the Court may enter the Order submitted, amend the Order, or direct oral argument.

TAKE FURTHER NOTICE that reliance will be placed upon the attached Memorandum of Law with exhibits.

TAKE FURTHER NOTICE that **oral argument is requested** and will be waived only if

no opposition is filed or if the Court determines that no oral argument is required.

TAKE FURTHER NOTICE that this matter is not yet scheduled for arbitration or trial.

Date: July 13, 2010

RICHARD D. MILLET & ASSOCIATES LLC
Attorneys for Defendant, Wal-Mart Stores, Inc.


By: _____
KIMBERLY L. RUTLEDGE, ESQ.

1065 Route 22 West, Suite 1A, Bridgewater, New Jersey 08807
Tel. No.: 908-595-1212
E-mail: krutledge@milletlaw.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

CAROLYN BALSAMIDES, and her husband,       :
MICHAEL BALSAMIDES

                                  :

            Plaintiffs,

VS.                              : CIVIL ACTION NO. 2:06-cv-5676 WHW

WAL-MART STORES, INC.  and /or JOHN DOES :
1-10 (fictitious names, real names unknown);

                                 :   **JURY TRIAL DEMANDED**

            Defendants.

                                  :

## CERTIFICATION OF COUNSEL IN SUPPORT OF
## DEFENDANT WAL-MART STORES, INC.'S
## MOTION FOR SUMMARY JUDGMENT

      I, Kimberly L. Rutledge, Esq., of full age hereby certify as follows;

1.      I am an attorney at law in the State of New Jersey and employed at Richard D. Millet & Associates LLC.  This firm represents Defendant Wal-Mart Stores, Inc. in this matter.  I have personal knowledge of the facts contained within this Certification.

2.      This case pertains to a claim for personal injuries by Plaintiffs' who allege that Plaintiff Carolyn Balsamides slipped and fell in the Wal-Mart store in Woodbridge, Middlesex County, New Jersey on March 17, 2005.  Wal-Mart denies that it was negligent.

3.      I have attached to the Memorandum of Law certain exhibits lettered "A" through "C". I certify that these documents are accurate copies of materials and deposition transcripts that have been obtained during the course of pre-trial discovery in this matter.

4.      For the reasons contained within this Motion, Wal-Mart respectfully submits that it is entitled to summary judgment dismissing all of Plaintiffs' claims against Wal-Mart with prejudice.

5.      I also certify that a true and correct copy of this Motion and all attachments was mailed via U.S.P.S. first class mail, postage prepaid, to Plaintiffs counsel at the below address on this date, July 13, 2010:

Peter Chamas, Esq.
Law Office of Gill & Chamas
655 Florida Grove Road
P.O. Box 760
Woodbridge, NJ 07095

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated:  July  13, 2010           By: _____
                                      KIMBERLY L. RUTLEDGE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

CAROLYN BALSAMIDES, and her husband,        :
MICHAEL BALSAMIDES

                                    :

               Plaintiffs,

VS.                                          : CIVIL ACTION NO. 2:06-cv-5676 WHW

WAL-MART STORES, INC.  and /or JOHN DOES :   CIVIL ACTION
1-10 (fictitious names, real names unknown);

                                  :

            Defendants.                  **JURY TRIAL DEMANDED**

                                  :

### ORDER DISMISSING PLAINTIFFS' COMPLAINT
### And GRANTING DEFENDANT WAL-MART STORES, INC'S
### <u>MOTION FOR SUMMARY JUDGMENT</u>

**THIS MATTER** having come before the Court on the Notice for Summary Judgment filed by

Defendant Wal-Mart Stores, Inc., (more properly designated as "Wal-Mart Stores East, LP");

and the Court having considered the movant's papers and any opposition submitted by Plaintiffs,

and good cause having been shown;

      **IT IS** on this _____ day of _____, 2010, hereby **ORDERED** that Defendant's

motion is **GRANTED**, and Plaintiffs' Complaint is **DISMISSED WITH PREJUDICE.**

      **SO ORDERED.**

                                  _____

                                  Hon. William H. Walls, U.S.D.J.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

CAROLYN BALSAMIDES, and her husband,         :
MICHAEL BALSAMIDES

                              :

              Plaintiffs,

VS.                                          : CIVIL ACTION NO. 2:06-cv-5676 WHW

WAL-MART STORES, INC.  and /or JOHN DOES :    CIVIL ACTION
1-10 (fictitious names, real names unknown);

              Defendants.                      :

                             **JURY TRIAL DEMANDED**

---

## STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF DEFENDANT, WAL-MART STORES, INC.'S
## NOTICE OF MOTION FOR SUMMARY JUDGMENT

Defendant Wal-Mart Stores, Inc., (more properly designated as Wal-Mart Stores East, LP, hereinafter "Wal-Mart"), submits this Statement of Facts As To Which There Exists No Genuine Issue For Trial, pursuant to Local Rule 56.1 and Rule 56 of the Federal Rules of Civil Procedure.

1.    Plaintiffs' Complaint alleges that Plaintiff Carolyn Balsamides was "caused to fall" in the Wal-Mart store in Woodbridge, Middlesex County, New Jersey on March 17, 2005.  Complaint, ¶ 1-3.  A true and correct copy of the Complaint is submitted herewith as Exhibit "A".

2.    Plaintiffs' Complaint was filed in the New Jersey Superior Court, Middlesex County, on September 20, 2006.  Defendant removed the action to this Court on November 20, 2006.

3.    Plaintiff Carolyn Balsamides was deposed in this action.  Excerpts from Plaintiff Carolyn Balsamides deposition transcript are submitted herewith as Exhibit "B".

4.    Plaintiff testified that she slipped and fell on baby oil in the beauty aisle.  Mrs. Balsamides' dep. 18: 5-7 (Ex. "B").

5.   Plaintiff testified that she did not see any baby oil present on the floor prior to her

accident.  Carolyn Balsamides dep. 19 (Ex. "B").

6.   Plaintiff's godmother, who was present with her at the time of the accident, never

mentioned that she saw the baby oil before plaintiff fell.

Q. Has she ever mentioned to you that she saw the baby oil before you fell?
A. No.
Q. Has she mentioned that she didn't see it?
A. At the time I fell, she asked what happened to my godchild.

Carolyn Balsimides dep. 22: 1-6 (Ex. "B").

7.   Plaintiff testified that the spill appeared to be fresh.

Q. Again, I'm referring to the oil that was not underneath you.  Do you
understand that?
A. Yes.
Q. When you saw that oil after you fell, what color was it?
A. It was clear.
Q. The oil that you saw, not the stuff that was underneath you, did it appear to
have footprints in it?
A. No.
Q. Did it appear to have shopping cart wheel marks running through it?
A. I cannot tell that—I don't know.
Q. But it was clear?
A. That was directly underneath my face, yes.

Carolyn Balsimides dep. 20: 18- 21: 9

8.   Plaintiff did not know how long the oil was present on the floor or where it came

from.  Carolyn Balsamides dep. 21 (Ex. "B").

9.   Plaintiffs deposed Wal-Mart's Assistant Manager Jacqueline Perun.  Excerpts
from Assistant Manager Perun's deposition transcript are submitted as Exhibit
"C".

10.  Ms. Perun testified that she reported to the scene after the incident had occurred.
Jacqueline Perun's dep. 30 (Ex. "C").

11.  Ms. Perun testified that the spill appeared to be fresh and clean.

Q. Did you personally make an observation of the area where she fell?
A. Yes.
Q. Did you see baby oil on the floor?
A. It was difficult to see.  It was clear, but I did see it eventually.  She said and
told me where it was.  I put the cones up, called someone over to clean it up.  It
was very difficult because it was clear.

Jacqueline Perun's dep. 30: 13-23 (Ex. "C").

12.    Ms. Perun testified about Wal-Mart's extensive efforts with regard to protecting the safety of its customers.

Q: So, you do a sweep of the outside?
A. Before you go in.
Q. You do a sweep inside with the maintenance workers?
A. You walk the floor with the overnight managers to make sure everything is clear.
Q. Who would make the determination if the store was safe for customers, if a customer was to come in?
A. All of us. I mean—the rule is that at seven a.m. there is nothing left on the floor. When you open the door you are ready for business.


*          *          *


Q. During the course of business hours, did you have that kind of sweep go on say, certain intervals?
A. Up until a year ago, I think, safety sweeps were announced in the store from the fitting room. We used to do our own. They are done from home office over the intercom, over Wal-Mart radio.
Safety sweeps are called. It's part of the safety team. It's part of the safety team's job to make sure all of the spill—spill stations. Spill station is –there are several marked with tape on the beams in every Wal-Mart. There is Spill Magic, which is an absorption paper towels, rubber gloves, dust pans and brooms for dry sweeps. Larger spills, like if somebody drops a quart of milk or juice, you page maintenance to that aisle and stay there. That is the procedure. You set up the cones. You call them and wait. Somebody stays there until its cleaned.
Q. That's after notification of the spill?
A. Of a spill. But the safety sweeps are done hourly in 2005.
Q. They were done hourly?
A. Announced for everyone on the sales floor to check their area, hangers, paper. Anything that's on the floor had to be off the floor.

Q: At eight o'clock on March 17th, 2005, there would have been an announcement over the PA all assistant managers check your stations?
A. All sales floor. Everyone is responsible for safety at Wal-Mart. It's not one man's job.
Q. So everyone would do a check? All employees?
A. Immediate area of –their immediate area to make sure their area was clear.


*          *          *


Q. Now going back now, if that was—you said eight o'clock, nine o'clock you have the same PA announcement, all sales force check your areas?
A. Yes.
Q. That was continuously until eleven o'clock that night until the store closed?

A. Yes.

Jacqueline Perun's dep. 18: 19 – 19: 6; 19: 23- 21:11, 22: 1-8 (Ex. "C").

RICHARD D. MILLET & ASSOCIATES, LLC
Attorneys for Defendant, Wal-Mart Stores, Inc.

BY: _____
        KIMBERLY L. RUTLEDGE, ESQ.

1065 Route 22 West, Suite 1A, Bridgewater, New Jersey 08807
Tel. No.: 908-595-1212

Date: July 13, 2010

## TABLE OF CONTENTS

Page

Factual and Procedural Background...........................................................................  1-2

Legal Standard For Summary Judgment................................................................  3

Plaintiffs Have Not Shown That Wal-Mart Breached Any Duty Owed to Them
Or Was Otherwise Negligent....................................................................................  3-8

Conclusion.................................................................................................................  9

## TABLE OF CITATIONS

**Cases Cited:**                                                                    **Page**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)...........................   3

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)..........   3

*Fireman's Ins. Co. v. Du Fresne*, 676 F.2d 965, 969 (3d. Cir. 1982).........................   3

*Znoski v. Shop-Rite Supermarkets, Inc.*, 122 N.J. Super. 243, 300 A.2d 164 (App. Div.

1973).................................................................................   3

*Simpson v. Duffy,* 19 N.J. Super. 339, 343 (App. Div. 1952).......................................   3

*Schumann v. Horn & Hardart Baking Co.*, 8 N.J. Super. 153 (App. Div. 1950)........   3-4

*Jerista v. Murray*, 185 N.J. 175, 191, 883 A.2d 350, 360 (2005)...............................   4

*Strachan v. John F. Kennedy Memorial Hosp.*, 109 N.J. 523, 529, 538 A.2d 346, 349

(1988)...............................................................................   4

*Szalontai v. Yazbo's Sports Cafe*, 183 N.J. 386, 400, 874 A.2d 507, 517 (2005).........   4

*Collier v. Borgata Hotel Casino & Spa*, 2009 N.J. Super. Unpub. LEXIS 2336 (N.J. App.

Div. Aug. 31, 2009).................................................................   4-5

*Parks v. Rogers*, 176 N.J. 491, 498 n. 3 (2003).............................................   5

*Nisivoccia v. Glass Gardens, Inc.*, 175 N.J. 559, 563 (2003)........................................   5, 7

*Dawson v. Bunker Hill Plaza Associates*, 289 N.J. Super. 309, 322-23, 673 A.2d 847,

853-54 (App. Div. 1996).................................................................   6

*Fedorczyk v. Caribbean Cruise Lines, Ltd.*, 82 F.3d 69, 75 (3d. Cir. 1996)..................   6

*Turck v. Kaywal Realty Co.*, 3 N.J. Super. 165, 168, 65 A.2d 757 (App. Div. 1949).....   7


*Butler v. Acme Markets, Inc.*, 89 N.J. 270, 283 (1982)..............................................   5-6

*Scott v. Fitzgerald*, 179 N.J. 114, 127 (2004)............................................................ 6

*Boland v. Dolan*, 140 N.J. 174, 188 (1995) .............................................................. 6

*Judson v. Peoples Bank and Trust Company of Westfield,* 7 N.J. 67, 74 (1954)........ 7

*Brill v. The Guardian Life Insurance Company of America*, 142 N.J. 520, 540 (1995)..7

*Prudential Prop. & Cas. Ins. Co. of Am. v. Boylan,* 307 N.J. Super. 162, 167, 704 A.2d 597 (App. Div.)................................................................................................................ 8

**Federal Rule of Civil Procedure:**

*F.R. Civ. Pro. 56(c)*...................................................................................................... 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CAROLYN BALSAMIDES, and her husband, MICHAEL BALSAMIDES | : |
| | : |
| Plaintiffs, | |
| VS. | : CIVIL ACTION NO. 2:06-cv- |
| 5676 WHW | |
| | |
| WAL-MART STORES, INC.  and /or JOHN DOES | : CIVIL ACTION |
| 1-10 (fictitious names, real names unknown); | |
| | : |
| Defendants. | |
| | : |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT , WAL-MART STORES, INC.'S,
## <u>MOTION FOR SUMMARY JUDGMENT</u>

Defendant Wal-Mart Stores, Inc. (more properly designated as Wal-Mart Stores

East, LP)

(hereinafter "Wal-Mart"), submits this Memorandum of Law in support of its motion

pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment

against Plaintiffs Carolyn Balsamides and Michael Balsamides on all claims alleged in

their Complaint.

## <u>FACTUAL AND PROCEDURAL BACKGROUND</u>

As set forth more fully in the Statement of Facts as to which there Exists No

Genuine Issue for Trial, Plaintiffs allege that Carolyn Balsamides fell at the Woodbridge

Wal-Mart store on March 17, 2005.  Statement of Facts, ¶ 1 and Ex. "A".  Specifically,

Plaintiff testified that baby oil present on the floor caused her accident.  Statement of

Facts, ¶ 4 and Ex. "B".  Plaintiff's godmother was present with her at the time of the

accident.  Neither plaintiff nor her godmother saw the baby oil prior to the accident.

Statement of Facts, ¶¶  5-6 and Ex. "B".

Plaintiff did not know the length of time the baby oil was present on the floor or

where it came from.  Statement of Facts, ¶ 8 and Ex. "B".  She confirmed that the spill

appeared to be fresh since it was clear and had no footprints or tracking marks through it.

Statement of Facts, ¶ 7 and Ex. "B".  Assistant Manager Jacqueline Perun responded to

the scene after the accident occurred.  Assistant Manager Perun also testified that the spill

appeared to be fresh since it was clear with no footprints or tracking marks through it.

Statement of Facts, ¶ 11 and Ex. "C".

Wal-Mart provides detailed instructions to all of its associates regarding the

handling of spills in particular and the performance of "safety sweeps" in general.

Statement of Facts, ¶ 12. and Ex. "C".  Wal-Mart Assistant Manager Jacqueline Perun

testified that all associates are instructed to guard a spill and to call for assistance to clean

it up.  Statement of Facts, ¶ 12 and Ex. "C".  She testified that all associates perform

safety sweeps every hour to look for potential hazards, because Wal-Mart focuses heavily

on customer safety and does not want anyone to get hurt.  Statement of Facts, ¶ 12.

## LEGAL ARGUMENT

In this case, Defendant is entitled to summary judgment. The spill was fresh and there is no evidence that Wal-Mart knew or should have known of the spill prior to the incident. Further, Wal-Mart has substantial procedures in place to detect and prevent the occurrence of incidents such as this. Ultimately, Plaintiff cannot demonstrate that Wal-Mart breached a duty of care owed to its retail customer.

### A.    Legal Standard For Summary Judgment.

Federal Rule of Civil Procedure 56(c) states that summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." For a dispute to be "genuine", the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the non-moving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party may not rely merely upon bare assertions, conclusory allegations, or suspicions. *See Fireman's Ins. Co. v. Du Fresne*, 676 F.2d 965, 969 (3d. Cir. 1982).

### B.    Plaintiffs Have Not Shown That Wal-Mart Breached Any Duty Owed To Them Or Was Otherwise Negligent.

A retailer is not an insurer of its patrons' safety. *Znoski v. Shop-Rite Supermarkets, Inc.*, 122 N.J. Super. 243, 300 A.2d 164 (App. Div. 1973); *Simpson v. Duffy*, 19 N.J. Super. 339, 343 (App. Div. 1952) citing *Schumann v. Horn & Hardart*

*Baking Co.*, 8 N.J. Super. 153 (App. Div. 1950).  To the contrary, in order to establish premises liability, a plaintiff must prove that the premises owner breached a duty of care owed to the Plaintiff.  *Jerista v. Murray*, 185 N.J. 175, 191, 883 A.2d 350, 360 (2005).  Further, whether a duty exists is a question of law for the Court to resolve, and its resolution turns generally on questions of fairness and policy.  *Strachan v. John F. Kennedy Memorial Hosp.*, 109 N.J. 523, 529, 538 A.2d 346, 349 (1988).  Under the law, proof of an incident alone is not adequate to create an inference of negligence.  A defendant's negligence is a fact which must be proven, and which will never be presumed.  The burden of proving such negligence is on the plaintiff.  *Szalontai v. Yazbo's Sports Cafe*, 183 N.J. 386, 400, 874 A.2d 507, 517 (2005).  The plaintiff has the burden of showing circumstances from which Wal-Mart's negligence is a reasonable and legitimate inference.

The law on premises liability for commercial property owners has been long-established and was recently applied in a similar factual scenario by the New Jersey Appellate Division.  In *Collier v. Borgata Hotel Casino & Spa*, 2009 N.J. Super. Unpub. LEXIS 2336 (N.J. App. Div. Aug. 31, 2009), the plaintiff approached a revolving door at the Borgata casino to check on the weather outside:

> "A surveillance recording played at trial [ ] showed him entering a revolving door and immediately falling.  He did not see anything on the floor, any signs, or any washers.  The weather was clear.  The tile floor was shiny and glowing.  He remembered his right foot slamming the door in front of him and his left leg was pinned below him when he fell.  A male Borgota security officer asked if he required assistance.  Plaintiff remembered feeling water on the floor around him; his hand and buttocks were soaked.  The security officer said 'There's water in there' and left to get housekeepers to place a warning sign.  Security guards helped plaintiff out of the door and asked him if he needed help."

*Id.* at 5.  The plaintiff subsequently sued Borgata for breach of its duty of care in

4

maintaining its premises.  The Appellate Division noted that in order to make out a prima facie case of premises liability, a plaintiff is required to show either that: 1) the defendant knew of the unsafe condition for a period of time prior to plaintiff's fall sufficient to permit the defendant to exercise reasonable care to correct it; or 2) that the condition existed for a sufficient length of time prior to plaintiff's injury that in the exercise of reasonable care defendant should have discovered its existence and corrected it.  *Collier*, 2009 LEXIS 2336 at *5.  The Collier court then found, in the context of determining whether a new trial was warranted on an evidence issue, that plaintiff had not shown how long the water was on the floor, and without that proof, "no reasonable jury could have ever concluded that defendant had sufficient time in which to exercise reasonable care to remove the water from the floor or should have discovered its existence and corrected it." *Id*.

In order to raise a jury question as to Wal-Mart's liability, the Plaintiffs must show that Wal-Mart created the hazard, or that Wal-Mart had actual or constructive notice of the hazard sufficiently in advance of the incident so that Wal-Mart had an opportunity to remedy the situation.  *Parks v. Rogers*, 176 N.J. 491, 498 n. 3 (2003) (property owner owes business visitor a duty to conduct a reasonable inspection of premises to guard against hazards of which the owner knew or should have known); *Nisivoccia v. Glass Gardens, Inc.*, 175 N.J. 559, 563 (2003) (business owner owes duty to invitee to discover and eliminate dangerous conditions, to maintain premises in safe condition, and to avoid creating conditions that would render premises unsafe).  There is no record evidence that Wal-Mart caused the spill.  There is no record evidence that Wal-Mart had actual notice of the spill.  There is no record evidence that the spill occurred

sufficiently in advance of Mrs. Balsamides' fall that Wal-Mart should be charged with constructive notice of the spill.

Moreover, Plaintiffs' must establish that Wal-Mart's alleged negligence was a "substantial factor" in causing her injuries. *Dawson v. Bunker Hill Plaza Associates*, 289 N.J. Super. 309, 322-23, 673 A.2d 847, 853-54 (App. Div. 1996) (plaintiff unable to establish, even with expert testimony, that crane company's negligence was a substantial factor in causing floor trusses to collapse). Plaintiff will be unable to establish that Wal-Mart's conduct relating to this incident was a substantial factor leading to the accident. The jury will not be permitted to speculate whether Wal-Mart's alleged negligence caused the incident. *Fedorczyk v. Caribbean Cruise Lines, Ltd.*, 82 F.3d 69, 75 (3d. Cir. 1996). Summary judgment in Wal-Mart's favor is warranted here.

In this case, Plaintiff contends that she was injured when she slipped and fell in a spill of baby oil on the floor. A source container for the substance was never found. Statement of Facts, ¶ 8. The spill was fresh and clean with no footprints or shopping cart wheel marks running through it (not even evidence of any marks that Plaintiff would have caused when she slipped), that could have been demonstrated that the spill was older and should have been seen by a Wal-Mart associate or found during a routine safety sweep. Statement of Facts, ¶ 12. Here, there is nothing about this particular incident that indicates that Wal-Mart's operation as a "self-service" retailer should be called into question. Nor is there record evidence that the property's condition played any role in the incident, or that Wal-Mart experienced a pattern of similar incidents. Instead, a customer may have inadvertently spilled this substance only seconds before Plaintiff happened upon it.

Moreover, Wal-Mart has come forward with evidence of the reasonable steps it takes to prevent incidents such as this from occurring.  Wal-Mart Assistant Manager Jacqueline Perun testified to Wal-Mart's practice of safety sweeps, and how seriously Wal-Mart takes the issue of its customers' safety.  Statement of Facts, ¶¶ 11-12.  As such, Wal-Mart has demonstrated that it has substantial procedures in place to protect its customers from any hazards associate with "self-service" retail shopping experience. Statement of Facts, ¶¶ 11-12.  To demand more of Wal-Mart would be to transform defendant into an insurer of its customers' safety, a drastic step that the law of this state has not seen fit to take.

The Supreme Court in *Nisivoccia*, *supra*, noted that, even in cases where defendant's "mode of operations" demanded closer scrutiny, the ultimate burden of persuasion remained with the plaintiff.  Id. at 565, 818 A.2d at 317.  Wal-Mart respectfully submits that Plaintiffs cannot meet this burden.  Plaintiff testified that the spill was clear and did not have any footprints through it, nor did she confirm the presence any shopping cart tracking marks through it either.  Statement of Facts, ¶ 7. Finally, Wal-Mart's witness testified to the extensive efforts Wal-Mart takes to protect its customers from any retail hazards.  Statement of Facts, ¶ ¶ 11-12.

New Jersey courts have held that where evidence adduced by plaintiffs is insufficient to meet their burden of proof in a negligence action, the case must be dismissed.  *Turck v. Kaywal Realty Co.*, 3 N.J. Super. 165, 168, 65 A.2d 757 (App. Div. 1949) (stating burden of proof in premises liability actions based on negligence); *see also Brill v. Guardian Life Insurance Co.of Am.,* 142 N.J. 520, 540, 666 A.2d 146 (1995);

7

*Prudential Prop. & Cas. Ins. Co. of Am. v. Boylan,* 307 N.J. Super. 162, 167, 704 A.2d 597 (App. Div.), *certif. denied*, 154 N.J. 608, 713 A.2d 499 (1998).

As discussed above, Plaintiffs have not produced any facts in discovery demonstrating that Wal-Mart knew or should have known of the spill. Mrs. Balsamides and Assistant Manager Perun both testified that the spill was untracked and appeared to be fresh. Statement of Facts, ¶¶ 7,11. Quite simply, plaintiff is unable to prove that Wal-Mart had actual or constructive notice of the spill. These facts, which are not rebutted by any contradictory evidence, warrant a holding that there can be no liability assessed against Wal-Mart as a matter of law.

## CONCLUSION

Plaintiffs cannot demonstrate any negligence by Wal-Mart that caused her accident since they cannot show that Wal-Mart had actual or constructive notice of the spill. There are no material facts remaining in dispute between the parties, and Wal-Mart is entitled to judgment as a matter of law. Wal-Mart respectfully requests the Court to enter summary judgment dismissing Plaintiffs' claims in their entirety.

Respectfully submitted,

RICHARD D. MILLET & ASSOCIATES, LLC
Attorneys for Defendant, Wal-Mart Stores, Inc.

BY: _____
       KIMBERLY L. RUTLEDGE, ESQ.

1065 Route 22 West, Suite 1A, Bridgewater, New Jersey 08807
Tel. No.: 908-595-1212

Date: July 13, 2010

9

EXHIBIT A

2006-11-13 13:18     ART     8266212 >>     P 5/13

LAW OFFICES OF GILL & CHAMAS
655 Florida Grove Road
PO Box 760
Woodbridge, NJ 07095
(732) 324-7600
Attorney for Plaintiff

| | |
|---|---|
| CAROLYNE BALSAMIDES, and his husband, MICHAEL BALSAMIDES,<br><br>Plaintiff,<br><br>vs.<br><br>WAL-MART STORES, INC., JOHN DOES 1-10 (fictitious names, real names unknown), ABC CORPS. 1-10 (fictitious names, real names unknown)<br><br>Defendants, | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: MIDDLESEX COUNTY DOCKET NO.: MID-L-_8613-06_<br><br>Civil Action<br><br>COMPLAINT AND JURY DEMAND |

Plaintiff, CAROLYNE BALSAMIDES, residing at 359 High Street in the City of Perth Amboy, County of Middlesex and State of New Jersey, by way of Complaint against the defendant, says:

### FIRST COUNT

1.     On or about March 17, 2005, plaintiff, CAROLYNE BALSAMIDES, was lawfully upon the premises owned by the defendants, WAL-MART STORES, INC., JOHN DOES 1-10 (fictitious names, real names unknown), and ABC CORPS. 1-10 (fictitious names, real names unknown), located in Woodbridge, New Jersey.

2.     Defendants, WAL-MART STORES, INC., JOHN DOES 1-10 (fictitious names, real names unknown), and ABC CORPS. 1-10 (fictitious names, real names unknown), were the person/persons responsible for owning, operating, manufacturing, inspecting, constructing, and/or maintaining the property in Woodbridge, New Jersey.

3.    At the time and place aforesaid, the defendants, through their agents, servants and/employees, so negligently, owned, inspected, manufactured, designed, constructed, and/or maintained said premises so as to cause a hazardous condition to exist and cause plaintiff to fall.

4.    As a direct and proximate result of the negligence of the defendants as aforesaid, the plaintiff, CAROLYN BALSAMIDES, sustained serious and permanent injuries. She has suffered and will in the future, suffer great pain; he has and will in the future be required to expend large sums of money for the cure and treatment of his injuries; and he has been and will in the future be unable to pursue his normal daily activities as before.

WHEREFORE, the plaintiff, CAROLYN BALSAMIDES, demands judgment against the defendants, for damages, together with interest and costs of suit.

## SECOND COUNT

1.    Plaintiff, MICHAEL BALSAMIDES, repeats and realleges each and every paragraph of the First Count of the Complaint and makes the same a part hereof by reference thereto.

2.    At all times herein mentioned, the plaintiff, MICHAEL BALSAMIDES, was and is the lawful husband of the plaintiff, CAROLYN BALSAMIDES, and as such, is entitled to her services, society and consortium.

3.    Solely because of the aforesaid negligence of the defendants and the result and injuries to the plaintiff, CAROLYN BALSAMIDES, the plaintiff, MICAHAEL BALSAMIDES, became deprived of the services, society and consortium of the plaintiff, CAROLYN BALSAMIDES.

WHEREFORE, plaintiff, MICHAEL BALSAMIDES, demands judgment against the defendants together with interest and cost of suit.

## JURY DEMAND

Plaintiff hereby demands a trial by jury as to all issues.

## REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to Rule 4:18-1, the plaintiff hereby demands that the defendant produce the following documentation within thirty (30) days as prescribed by the Rules of the Court. Additionally, please be advised that the following requests are ongoing and continuing in nature and the defendant is therefore required to continuously update its responses thereto as new information or documentation comes into existence.

1.    The amounts of any and all insurance coverage covering the defendant, including but not limited to, primary insurance policies, secondary insurance policies and/or umbrella insurance policies. For each such policy of insurance, supply a copy of the declaration page therefrom.

2.    Copies of any and all documentation or reports, including but not limited to, police reports, accident reports and/or incident reports concerning the happening of the incident in question or any subsequent investigation of same.

3.    Copies or duplicates of any and all photographs, motion pictures, videotapes, films, drawings, diagrams, sketches or other reproductions, descriptions or accounts concerning the individuals involved in the incident in question, the property damage sustained, the accident scene, or anything else relevant to the incident in question.

4.    Copies of any and all signed or unsigned statement, documents, communications, and/or transmissions, whether in writing, made orally or otherwise recorded by any mechanical or electronic means, made by any party to this action, any witness, or any other individual, business, corporation, investigative authority or other entity concerning anything relevant to the incident in question.

5. Copies of any and all documentation, including but not limited to, any contracts between the owner of the property or product involved in the incident in question and any of the parties involved in this matter.

6. Copies of any and all contracts between any of the parties involved in the incident in question.

7. Copies of any and all documentation concerning any lease agreements between the lessor(s) and the lessee(s) concerning the incident in question.

8. Copies of any and all documentation, including but not limited to, safety manuals, statues, rules, regulations, books, and/or industry standards which refer to, reflect or otherwise relate to the incident in question or any potential defense to the action in question.

9. Copies of any and all permits applied for by the parties to the action in question concerning either the product in question, the accident scene, or anything else relevant to the happening of the accident in question.

10. Copies of any and all permits received by the parties to the action in question concerning either the product in question, the accident scene, or anything else relevant to the happening of the accident in question.

11. Copies of any and all discovery received from any other parties to the action in question.

12. Copies of any and all reports on the plaintiff received by the defendants, or any other party to this suit, from either the Central Index Bureau (C.I.B.) or from any other source.

13. Copies of any and all reports and/or other investigations performed by O.S.H.A. or any other investigative authority.

14.     Copies of any and all medical information and/or documentation concerning the plaintiff in this matter whether it concerns any medical condition or treatment which took place before, during or after the time of the incident in question.

15.     Copies of any and all records of any type subpoenaed by the defendant or received from any other source concerning the plaintiff or the incident in question.

16.     A list of employees present at the job site or accident site, their names, addresses and job titles.

## DEMAND FOR ANSWERS TO INTERROGATORIES

Demand is hereby made on the defendant(s) to answer fully and responsively Form C and C-1 and/or Form C-2 uniform interrogatories, personal injury, Superior Court found in Appendix II as provided by R.4:17-1(b) (ii) and the other applicable Rules of Court.

## DEMAND FOR PERMISSION TO VIEW PREMISES

Plaintiff(s) hereby demand, pursuant to R.4:18-1, that they and/or their legal representatives be permitted entry to the premises of defendants located at Woodbridge, New Jersey, of this Complaint for the purpose of inspection and/or photographing the area this incident complained of occurred

## NOTICE OF DESIGNATION OF TRIAL COUNSEL

PLEASE TAKE NOTICE that, pursuant to the Rules of the Court, ROBERT LEIGHT, ESQ. is hereby designated as trial counsel of the within matter.

LAW OFFICES OF GILL & CHAMAS
Attorneys for the Plaintiff

By: _____
ROBERT LEIGHT, ESQ.

Dated: September 20, 2006

CERTIFICATION

I certify that the within matter is not the subject of any other pending court or arbitration proceeding.

LAW OFFICES OF GILL & CHAMAS
Attorney for Plaintiff

By: _____
ROBERT LEIGHT, ESQ.

Dated:   September 20, 2006

<u>CERTIFICATION PURSUANT TO R. 4:5-1</u>

I, ROBERT LEIGHT, do hereby certify as follows:

1.      I am an attorney at law of the State of New Jersey and am a member of the firm and as such, I am fully familiar with same.

2.      To the best of my knowledge, confirmation and belief, there is no other action pending about the subject matter of this Complaint in the Superior Court of New Jersey, Law Division, Middlesex County.  Additionally, there are no other persons known to me who should be added as parties to this matter, nor are there any other actions contemplated.

3       I do hereby certify that the foregoing statements made by me are true to the best of my knowledge.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

ROBERT LEIGHT, ESQ.
Attorney for Plaintiff

Dated: September 20, 2006

EXHIBIT B

BALSAMIDES vs. WAL-MART                          CAROLYN A. BALSAMIDES, 10/30/07

---

**18**

C. Balsamides - Millet

1  A.   I'd say half hour.
2     Q.     At the time of the accident did
3  you have a shopping cart with you?
4  A.   She did.
5     Q.     Where in the store did the accident
6  occur?
7  A.   The beauty isle.
8     Q.     What happened while you were in the
9  beauty aisle?
10 A.   She was behind me with the cart, and I was in
11 front of her walking down the aisle.  My foot hit
12 something, and I flew through the air forward, and
13 then went down on my left wrist and my face went
14 into my left wrist and I got hit with baby oil in my
15 face.  I landed on my knee and twisted to the left,
16 and my left foot went up underneath my behind.
17    Q.     After you fell, were you conscious?
18 A.   Yes.
19    Q.     After you fell, did you look around you
20 to see what it was that may have caused you to fall?
21 A.   It was in my face.
22    Q.     What was that?
23 A.   Baby oil.
24    Q.     Did you see baby oil on the floor?
25 A.   Yes.

---

**19**

C. Balsamides - Millet

1     Q.     Where was the baby oil in relation to you
2  when you saw it on the floor?
3  A.   I was on top of it.
4     Q.     Was it anywhere else other than
5  underneath you, the baby oil?
6  A.   It was pretty well a lot underneath me.  It was
7  underneath my whole body at that point.
8     Q.     Was it on your clothes?
9  A.   Yes.
10    Q.     Was it on the bottom of your shoes?
11 A.   Yes.
12    Q.     What kind of shoes were you wearing?
13 A.   I was wearing black leather shoes that had
14 grips on the bottom of them.
15    Q.     Had you seen the baby oil before you
16 fell?
17 A.   No.
18    Q.     Was there any baby oil around you that
19 was not underneath?
20 A.   I think there was some going in front of me
21 continuing on.
22    Q.     For about what distance?
23 A.   I was kind of at the end of the aisle at that
24 point when I landed.  So I believe it was going
25 around the aisle.

---

**20**

C. Balsamides - Millet

1     Q.     How large an area was covered by it?
2  A.   Quite a bit.
3     Q.     Can you estimate for us?
4  A.   No.
5     Q.     Was the entire aisle covered with baby
6  oil?
7  A.   No, no.
8     Q.     Was it just in one small section that was
9  covered in baby oil?
10 A.   No, it was quite a bit towards the end of that
11 aisle.
12    Q.     Was this one of the side aisles or was
13 this one of the extra large main isles in the store?
14 A.   No, it was one of the side aisles.
15    Q.     Was the baby oil covering the side aisle
16 from one side to the other width wise entirely?
17 A.   Pretty much.
18    Q.     Again, I'm referring to the oil that was
19 not underneath you.  Do you understand that?
20 A.   Yes.
21    Q.     When you saw that oil after you fell,
22 what color was it?
23 A.   It was clear.
24    Q.     The oil that you saw, not the stuff that
25 was underneath you, did it appear to have footprints

---

**21**

C. Balsamides - Millet

1  in it?
2  A.   No.
3     Q.     Did it appear to have any shopping cart
4  wheel marks running through it?
5  A.   I cannot tell that -- I don't know.
6     Q.     Was it dirty?
7  A.   I don't know.
8     Q.     But it was clear?
9  A.   That was directly underneath my face, yes.
10    Q.     Did you see the source of that baby oil
11 anywhere?
12 A.   No, no.
13    Q.     Did you see any broken bottles of baby
14 oil on the floor?
15 A.   No.
16    Q.     Did you see any open bottles of baby oil
17 sitting on a nearby shelf?
18 A.   No.
19    Q.     Do you have any idea where the baby oil
20 may have come from?
21 A.   No.
22    Q.     Have you spoken with Lynn Marcus about
23 how the accident happened at any time since the day
24 of the accident?
25 A.   No.

---

BALSAMIDES vs. WAL-MART                                    CAROLYN A. BALSAMIDES, 10/30/07

---

**22**

C. Balsamides - Millet

1    Q.    Has she ever mentioned to you that she
2    saw the baby oil before you fell?
3    A.    No.
4    Q.    Has she mentioned that she didn't see it?
5    A.    At the time I fell, she asked what happened to
6    my godchild.
7    Q.    How did you feel immediately after you
8    fell?
9    A.    Embarrassed, sore.
10    Q.    Where were you sore?
11    A.    In my wrist.
12    Q.    Which wrist?
13    A.    Left wrist; my knee, left knee, my foot, left
14    foot, left ankle, and my lower back.
15    Q.    Anywhere else?
16    A.    No.
17    Q.    At that time?
18    A.    No, not at that time, no.
19    Q.    Did you seek medical attention that day?
20    A.    Yes.
21    Q.    How did you get up off the floor?
22    A.    My godmother brought the shopping cart over,
23    and I tried to help myself to get up using the
24    shopping cart as leverage to try to get up.  She
25    tried to help me a little bit, but I told her no.

---

**23**

C. Balsamides - Millet

1    Q.    How did you get up?
2    A.    Using the shopping cart.  She held the back of
3    it, and I used that as leverage to get up.
4    Q.    Did you report the accident to the store
5    that day?
6    A.    I hobbled to the -- I was one aisle away from
7    the pharmacy.  The pharmacy has a bench in the front
8    of it, and I hobbled to the bench and sat down and
9    proceeded -- a woman came up at that point and got
10    the manager of the store.  I sat there, and she
11    brought a report over and filled out a report of
12    what happened, and they proceeded to try to clean
13    up the aisle using sand, and then a woman came up at
14    that point and said that she had noticed the baby oil
15    and had gone and reported it, but it was too late; I
16    had fallen on it.
17    Q.    Do you know the name of that woman?
18    A.    No.
19    Q.    Was it a customer?
20    A.    Yes, she went to Courtesy.
21    Q.    So while you were having your accident,
22    this unidentified customer who had just seen the oil
23    was either on her way or was at Courtesy reporting
24    it?
25    A.    I guess so.

---

**24**

C. Balsamides - Millet

1    Q.    Did she say when she had been to
2    Courtesy to report it?
3    A.    At that time.
4    Q.    When you were having your accident?
5    A.    I guess so.
6    Q.    Do you know of anyone else who was a
7    witness to the happening of your accident?
8    A.    No.
9    Q.    Where did you go for medical attention
10    that day?
11    A.    Raritan Bay Medical Center, Raritan Bay
12    Hospital.
13    Q.    Before you left the store, did the
14    manager ask if you would fill out an incident report
15    or a customer statement form?
16    A.    Yes.
17    Q.    Did you do so?
18    A.    Yes.
19    Q.    Was the information you had provided
20    truthful and accurate?
21    A.    Yes.
22    Q.    Did you go to the emergency room at
23    Raritan Bay?
24    A.    Yes.
25    Q.    Did you stay overnight?

---

**25**

C. Balsamides - Millet

1    A.    No.
2    Q.    What was done for you in the emergency
3    room?
4    A.    They gave me X-rays.
5    Q.    To what parts of your body?
6    A.    To my left wrist, my knee, my lower back, my
7    left foot.
8    Q.    Were you then told to see your own
9    doctor?
10    A.    I was told to go see an orthopedist.
11    Q.    Who did you go to?
12    A.    Dr. Edger Martierez.
13    Q.    Where is his office?
14    A.    I believe he is considered I believe it's Old
15    Bridge.  He is kind of on the borderline of Parlin,
16    Sayreville, Old Bridge.  He's on Route 34 where it
17    splits.
18    Q.    How did you end up going to his office?
19    A.    Aetna, my insurance company at the time,
20    recommended him.
21    Q.    Was that your auto insurance or health
22    insurance?
23    A.    My health insurance.
24    Q.    For how long did you treat with Dr.
25    Martierez?

---

EXHIBIT C

6

1    Do you understand that?
2    A.   That means assume nothing.
3    Q.   Yes.  Assume nothing.
4        I'm going to ask you questions about
5    time, maybe distance.  If you could estimate for
6    me, estimate.  If you don't recall, "I don't
7    recall" is a perfectly acceptable answer.
8    A.   All right.
9    Q.   Again, everything is being taken
10   down.  Every answer has to be verbalized.  I'm
11   Italian, I use my hands and shrug my shoulder and
12   we can't use that in deposition testimony.
13   Everything must be verbalized.
14       Do you understand that?
15   A.   Yes.
16   Q.   Are you under any medications that
17   would inhibit your ability to answer my questions?
18   A.   No.
19   Q.   What is your full name for the
20   record?
21   A.   Jacqueline Nancy Perun.
22   Q.   Jackie, where do you currently
23   reside?
24   A.   Whitehouse Station, New Jersey.
25   Q.   Where are you currently employed?

7

1    A.   Wal-Mart Edison, New Jersey.
2    Q.   Can you give your educational
3    background?  Where you when to high school?
4    A.   I'm a high school graduate.  I have
5    taken 14 credits, nights.
6    Q.   Where had you taken the credits?
7    A.   Raritan Valley.
8    Q.   That is a community college?
9    A.   Yes.
10   Q.   How long have you been working for
11   Wal-Mart?
12   A.   My anniversary with Wal-Mart is
13   August 28th.  I will be with them 11 years this
14   year.
15   Q.   What year did you start with
16   Wal-Mart?
17   A.   1998.
18   Q.   In what capacity were you hired?
19   When you started at Wal-Mart?
20   A.   Hourly supervisor.
21   Q.   Was there a specific store you were
22   employed at?
23   A.   Manville.
24   Q.   What was your position as an hourly
25   supervisor?  What did you do?

8

1    A.   I was the manager over accessories.
2    Five departments.
3    Q.   All at the Manville location?
4    A.   All in accessories, yes, in Manville.
5    Q.   How long did you have that position
6    for?
7    A.   One year.
8    Q.   What happened after the one year?
9    A.   I went into the management training
10   program.
11   Q.   What do you mean by that?
12   A.   Wal-Mart trains their assistants for
13   several months, depending on what the course is
14   in, operations, merchandising, whatever needs to
15   be learned to become an assistant manager.
16   Q.   You did that after a year at
17   Manville?
18   A.   Yes.
19   Q.   Where did you do your training at?
20   A.   Piscataway.
21   Q.   How long was the training for?
22   A.   Mine was extended to four months
23   because I opened -- they pulled me out to open
24   another store, Hackettstown.
25   Q.   Your training was --

9

1    A.   Stopped.
2    Q.   Stopped.  Interrupted?
3    A.   Interrupted to do something else.
4    Q.   You went back for training?
5    A.   Correct.
6    Q.   You said you did operations training?
7    A.   Yes.
8    Q.   Merchandising training?
9    A.   Yes.
10   Q.   What would operations training do?
11   What does that entail?
12   A.   As a manager with Wal-Mart, you are
13   responsible for a total store, cash office,
14   invoicing, claims, receiving.  That's just part of
15   the operations.  You must familiarize yourself
16   with all of those areas -- oh, personnel, U.P.C.,
17   I mean -- I take it for granted.  I've done it for
18   so long, but you must be familiar with all parts
19   of the store.
20   Q.   What type of training do you get
21   concerning safety?
22   A.   Safety training is done on CBLs.  You
23   are part of a safety team.  Members of management
24   are included, weekly safety meetings with the
25   store manager.

3 (Pages 6 to 9)

10

1    Q.   The training that you receive, is
2  that all oral or do you get written booklets?
3    A.   Everything -- safety is -- there is a
4  subject published for a safety topic every two
5  weeks.
6    Q.   How is that --
7    A.   On the Wire, which is Wal-Mart's
8  method of training and communication.  There is
9  not a company in the world that offers more
10  information than Wal-Mart to its associates,
11  whether it be hourly or --
12    Q.   What is On the Wire?
13    A.   On the Wire is their name for their
14  software.
15    Q.   So, is it --
16    A.   It's basically a -- information
17  systems.
18    Q.   How would an employee go about
19  getting that information from the information
20  system?
21    A.   Every associate is assigned a
22  password and an ID.  Every associate has access to
23  the wire for MSDS, safety information,
24  merchandising information, training plans, whether
25  they be on the floor or the back room or anywhere.

11

1    Q.   Now, was that type of assistance
2  available as of March 17th, 2005?
3    A.   That assistance has been available
4  since I was hired in 1998.
5    Q.   As far as your knowledge, that has
6  been continuous since 1998?
7    A.   Yes.  It is continuously updated.
8    Q.   As of 2005, was it mandatory for an
9  assistant manager to go on that information system
10  or voluntary?
11    A.   It is both.
12    Q.   What do you mean by that?
13    A.   Updates to pertinent changes in
14  policy come down in a notification to personnel in
15  what is called a CBL, which is computer-based
16  learning.  Everyone in the building does CBLs.
17    Q.   How does Wal-Mart -- as an assistant
18  manager, would you have been responsible to make
19  sure your underlings were on that system?
20    A.   Yes.
21    Q.   How would you go about monitoring
22  whether or not someone was on the system?
23    A.   You print a report that tells you
24  they did it or they didn't.
25    Q.   Simple as that?

12

1    A.   Simple as that.
2    Q.   After your training, where did you
3  go?
4    A.   Princeton.
5    Q.   How long were you at the Princeton
6  location?
7    A.   A year and a half, I think.
8    Q.   What was your job description at
9  Princeton?
10    A.   Assistant manager.
11    Q.   Once you, for lack of a better term,
12  graduated from the training program, you became an
13  assistant manager?
14    A.   Yes.
15    Q.   Where did you go after the Princeton
16  location?
17    A.   Union.
18    Q.   How long were you at the Union
19  location for?
20    A.   I believe a year.
21    Q.   How about after the Union location?
22    A.   Manville.
23    Q.   How long were you at the Manville
24  location for?
25    A.   I want to say year and a half to two

13

1  years.
2    Q.   At the present location, you were
3  assistant manager.
4    Correct?
5    A.   Correct.
6    Q.   At the Union location you were
7  assistant manager?
8    A.   Yes.
9    Q.   At the Manville you were assistant
10  manager?
11    A.   Yes.
12    Q.   Were your duties relatively the same
13  in all three locations?
14    A.   No.
15    Q.   What were your duties at the
16  Princeton location?
17    A.   In Princeton I started as -- and
18  started in apparel.  As an assistant manager you
19  have a section of the store you are responsible
20  for primarily.  Those divisions of work are
21  divided between whatever assistants are in the
22  building.
23    Q.   As of March 2005, typically, would
24  there be more than one assistant manager at each
25  location?

4 (Pages 10 to 13)

**14**

1      A.   Yes.
2      Q.   Would it depend on the size of the
3  store as to the amount of assistant managers?
4      A.   Sales volume determines amount of
5  assistant managers.
6      Q.   So, the more product is going off the
7  shelves, you have more assistant managers at that
8  location?
9          Is that a fair statement?
10     A.   It's all about numbers.  The more
11  that comes in the back door, the more that has to
12  be processed on the back room on the sales floor
13  and out the door.
14     Q.   Did come a time you worked at the
15  Woodbridge location?
16     A.   Yes.  I was promoted to co-manager
17  for Woodbridge.
18     Q.   When was that?  Do you recall the
19  year?
20     A.   The year they opened, which I'm not
21  sure.  I think it was 2004, the fall.
22     Q.   You were appointed co-manager of the
23  store?
24     A.   Yes.
25     Q.   Did you hold that position as of

**15**

1  March 17th, 2005?
2      A.   Yes.
3      Q.   Who was the other co-manager?
4      A.   There was no other co.  There was a
5  store manager.
6      Q.   Who was the store manager at the
7  time?
8      A.   Bill Marie Bracco.
9      Q.   Do you know if she is still with
10  Wal-Mart as an employee?
11     A.   She is and she is in Puerto Rico.
12     Q.   Her first name?
13     A.   Bill Marie.
14     Q.   Her last name?
15     A.   Bracco.
16     Q.   Is she on vacation in Puerto Rico
17  or --
18     A.   No.  She is living in Puerto Rico.
19     Q.   How many assistant managers were at
20  the Woodbridge location, on or about March 2005?
21     A.   At least six.
22     Q.   Are any of the assistant managers
23  still employed, to the best of your recollection,
24  at Wal-Mart?
25     A.   At least five of the six.

**16**

1      Q.   Are any still employed at the
2  Woodbridge location?
3      A.   Two of them are.
4      Q.   Do you know their names?
5      A.   Lisa and Joe Green.  And Lisa got
6  married.  Her last name is Cruz.  Her married name
7  is Cruz.
8      Q.   In what capacity was Lisa employed at
9  Wal-Mart back in 2005?
10     A.   Assistant manager.
11     Q.   What department?
12     A.   She had consumables.
13     Q.   What does that mean?
14     A.   Products we consume, food, deodorant,
15  soap.
16     Q.   How about Joe Green?
17     A.   I believe Joe was on overnights at
18  the time.  I truly want to remember all those job
19  classifications from three years ago.
20     Q.   What were your responsibilities as a
21  co-manager of the store?
22     A.   As a co you are responsible for a
23  large part of the operations, accounting
24  department, making sure money is correct, making
25  sure all of the compliance reports are filed,

**17**

1  making sure the assistant managers are doing their
2  job, which is a big part of it, and --
3      Q.   What were the, if you recall, the
4  store hours of the Wal-Mart store in Woodbridge on
5  or about March 2005?
6      A.   I believe they were seven to 11.
7          Seven a.m. to 11 p.m. and still are.
8      Q.   That would be seven days a week?
9      A.   Seven days a week.
10     Q.   What were your hours back then?
11     A.   All management works rotating shifts,
12  unless you are scheduled on overnights, which is
13  consistently overnight.  We would open some
14  mornings and close others.
15          That is how we run our business.
16     Q.   When someone would open the store at
17  seven a.m., would they do -- what, essentially,
18  happened?  How would you open the store?  What
19  kind of check would you do for -- to ensure
20  customer safety?
21     A.   The opening manager tours the entire
22  store and that includes the back room with the
23  overnight assistant to make sure the floor is
24  clear and ready for business.  The last thing done
25  in the morning is the overnighters, maintenance

5 (Pages 14 to 17)

18

```
1   crew from overnight is doing the last safety sweep
2   to make sure there is no cardboard or loose paper
3   from doing all of the stocking on overnight.
4       Q.   To your recollection, was there ever
5   any stocking done during the course of the
6   business hours?
7       A.   Stocking is done during business
8   hours from carts.
9       Q.   Did you ever have a chance where you
10  had to open the store at seven a.m.?
11      A.   Often.
12      Q.   When you had to open the store at
13  seven a.m., what time did you usually arrive at
14  the store?
15      A.   You arrived before seven because you
16  have to check the building.  You have to check the
17  outside of the building before you go in the
18  building.
19      Q.   So, you do a sweep of the outside?
20      A.   Before you go in.
21      Q.   You do a sweep inside with the
22  maintenance workers?
23      A.   You walk the floor with the overnight
24  managers to make sure everything is clear.
25      Q.   Who would make the determination if
```

19

```
1   the store was safe for customers, if a customer
2   was to come in?
3       A.   All of us.  I mean -- the rule is
4   that at seven a.m. there is nothing left on the
5   floor.  When you open the door you are ready for
6   business.
7       Q.   Would -- when you basically cleared
8   the store and you thought it was safe for
9   customers to come in, would you write a written
10  report concerning that or was that your personal
11  observations as a store manager?
12      A.   It is a daily procedure, not a
13  written report.  It is a daily procedure.
14      Q.   Every day you do the same thing,
15  Monday through --
16      A.   Everyday, Saturday through Friday it
17  is done.  Our week starts on Saturday.
18      Q.   Every day would be the same thing?
19      A.   Every day.
20      Q.   You would make an observation it was
21  safe to open up the doors?
22      A.   Yes.
23      Q.   During the course of a business
24  hours, did you have that kind of sweep go on at
25  say, certain intervals?
```

20

```
1       A.   Up until a year ago, I think, safety
2   sweeps were announced in the store from the
3   fitting room.  We used to do our own.  They are
4   done from home office over the intercom, over
5   Wal-Mart radio.
6           Safety sweeps are called.  It's part
7   of the safety team.  It's part of the safety
8   team's job is to make sure all of the spill --
9   spill stations.  Spill station is -- there are
10  several marked with tape on the beams in every
11  Wal-Mart.  There is Spill Magic, which is an
12  absorption paper towels, rubber gloves, dust pans
13  and brooms for dry sweeps.  Larger spills, like if
14  somebody drops a quart of milk or juice, you page
15  maintenance to that aisle and stay there.  That is
16  the procedure.  You set up the cones.  You call
17  them and wait.  Somebody stays there until it's
18  cleaned.
19      Q.   That's after notification of a spill?
20      A.   Of a spill.  But the safety sweeps
21  are done hourly in 2005.
22      Q.   They were done hourly?
23      A.   Announced for everyone on the sales
24  floor to check their area, hangers, paper.
25  Anything that's on the floor had to be off the
```

21

```
1   floor.
2       Q.   At eight o'clock on March 17th, 2005,
3   there would have been an announcement over the PA
4   all assistant managers check your stations?
5       A.   All sales floor.  Everyone is
6   responsible for safety at Wal-Mart.  It's not one
7   man's job.
8       Q.   So, everyone would do a check?  All
9   employees?
10      A.   Immediate area of -- their immediate
11  area to make sure their area was clear.
12      Q.   Now, that was if someone did -- let's
13  say there was a spill, they would contact whom at
14  that point?
15      A.   Who do you mean?
16      Q.   If I worked in the dairy aisle and
17  there was a carton of milk on the floor, I called
18  up, I see milk on the floor, who would I call?
19      A.   First you put safety cones in front
20  of it from the aisle, because that's an aisle that
21  does tend -- people tend to drop things or slip on
22  things if they are wet and you go to the phone and
23  page for maintenance for a wet spill.  If it was
24  something they couldn't pick up themselves, paper
25  towels would absorb.
```

6 (Pages 18 to 21)

**22**

1    Q.   Now, going back now, if that was --
2  you said eight o'clock, nine o'clock you have the
3  same PA announcement, all sales force check your
4  areas?
5    A.   Yes.
6    Q.   That was continuously until eleven
7  o'clock that night until the store closed?
8    A.   Yes.
9    Q.   Just to make sure, is it fair to say
10 that you would make a visual sweep of it and not
11 write anything down, any of the sales force?
12   A.   Correct.
13   Q.   It was basically on the honor system
14 these salespeople went and did what they were
15 supposed to do?
16      MS. MERCADO:  Objection to form.  You
17   can answer.
18   A.   That's their job, not their honor
19 system.
20   Q.   That's what they were told to do.
21   Correct?
22   A.   That's what they were taught to do.
23   Q.   On or about March 2005, was part of
24 your duties as co-manager to hire and fire
25 employees?

**23**

1    A.   Yes.  That is something that I did,
2  have done or would may have done if it was
3  warranted by policy.  You just don't fire people.
4    Q.   How about the hiring process, did you
5  hire people?
6    A.   Yes.
7    Q.   If I applied for a job on or about
8  March 17th, 2005 at a Wal-Mart, what would be my
9  application process in order to become an
10 employee?
11   A.   In 2005?
12   Q.   Yes.
13   A.   You would fill out a paper
14 application, submit it to personnel.  If we had
15 job openings, they would be reviewed.  They were
16 reviewed, primarily reviewed by whoever needed
17 someone in an area.  The assistant over that area
18 would review applications to see who was
19 available, primarily availability is an issue in a
20 retail store.  Retail is not eight to five.
21 Retail is, in Wal-Mart, 24 hours a day.  We are
22 open from seven to 11, but we work 24 hours a day.
23 Anyone who wished full-time employment with
24 Wal-Mart, and to this day this is true, you need
25 to be available when our customers are in the

**24**

1  store.
2    Q.   If I was hired, what kind of training
3  would I get at Wal-Mart, if I was a sales
4  employee?
5    A.   There is a training plan involved.
6  There is a training plan for every job in the
7  company.
8    Q.   Would that training for that employee
9  entail safety concerns for customers?
10   A.   Yes.
11   Q.   What type of training would that
12 sales employee receive?
13   A.   Computer-based learning, always pass
14 CBLs, introduction to the safety team and review
15 of safety stations.
16   Q.   On or about March 17th, 2005, was
17 there a specific assistant manager at the store
18 who was called a safety monitor?
19   A.   There would have been, but I cannot
20 remember who it was.  There was an assistant over
21 the safety team.
22   Q.   Was there somebody in charge of
23 safety?
24   A.   With the safety team.
25   Q.   With the safety team?

**25**

1    A.   Which is -- the safety team is chosen
2  by an associate from each area of the store.
3  Hourly associate from overnight is an overnight,
4  hourly associate from apparel, hourly associates,
5  from home lines, hard lines, an assistant oversees
6  that and the store manager oversees that assistant
7  and the safety team.
8    Q.   Do you know a Kim, D-a-n-g?
9    A.   I don't know her.  He is one of the
10 visiting pharmacists.  Kim is a male.
11   Q.   Is he still employed at Wal-Mart?
12   A.   I believe so.  I haven't been there
13 for a long time.
14   Q.   Where are you currently assigned?
15   A.   Edison.  I believe Kim was a fill-in
16 pharmacist.  We have several pharmacists who go
17 from store to store filling in when those regular
18 pharmacists are off.
19   Q.   On or about March 17th, 2005, when
20 you have a customer who slips and falls in the
21 store, what is the protocol concerning that slip
22 and fall?
23   A.   First make sure the customer is okay.
24 Second, take the report.  Third, isolate the
25 spill.  If it's a spill, it may not have been a

7 (Pages 22 to 25)

26

1  spill, it could have been a trip.  Sometimes
2  people trip.
3      Q.    Who would take the incident report?
4      A.    Whoever, whatever member of
5  management answered the call.
6      Q.    So, it could have been an assistant
7  manager, co-manager or manager?
8      A.    Correct.
9      Q.    Who was the person who investigated
10  the report?  How would they enter the information
11  into the system?  How would you go about rendering
12  a report concerning the slip and fall?
13      A.    You take the customer's statement.
14  You do what you have to do after the customer is
15  taken care of, or the associate, if it's an
16  associate, you go to the computer On the Wire,
17  again, claims management and enter the report.
18      Q.    I'm going to show you what I have
19  marked as Plaintiff's Exhibit 1 for
20  identification.  It's a two-page report.
21          Have you ever seen this prior to
22  today?
23      A.    She showed it to me this morning.
24          MS. MERCADO:  Yes.
25      A.    Only to remind me.

27

1      Q.    Anything you talked with your
2  attorney is privileged, so I don't delve into that
3  kind of stuff.
4      A.    This is a standard claim.  When you
5  have an incident with a customer you enter it and
6  whether you -- if you have an accident, you enter
7  it with a customer.  You enter all of the
8  information you have been given and it creates
9  this form and we print a copy for the store and we
10  print a copy for CMI and we mail it to them.
11      Q.    By looking at this two-page report,
12  can you make a determination as to who inputted
13  the information concerning the slip and fall?
14      A.    This was me.
15      Q.    By looking at the form, how can you
16  determine you made the determination that you
17  inputted it?
18      A.    Associate with facts related to the
19  incident.
20          Also, customer -- entering claim into
21  incident reporting system, me.  I knew it was in
22  there.
23      Q.    You made this report?
24      A.    Correct.  "Associate entering claim
25  into incident reporting system (Jacqueline,

28

1  co-manager)."
2      Q.    Information you entered was the best
3  of your information at the time?
4      A.    The information that I had available
5  to me because you must enter them immediately, as
6  soon as you can get to the system and mandatory,
7  within 24 hours.
8      Q.    Also, looking at the report, can you
9  tell what happened -- who was the person who fell
10  at the Wal-Mart location in Woodbridge?
11          Can you determine that by the report?
12      A.    Their name is not on here.
13      Q.    You have, on the second page of the
14  report, you have --
15      A.    Carolyn.  There it is.  Carolyn
16  Balsamides.
17      Q.    That's who it was?
18      A.    Yes.
19      Q.    Looking at the report, can you tell
20  me what happened to her on March 17th, 2005?
21      A.    I was called to the pharmacy for a
22  code white, which is an accident.  Carolyn was
23  sitting on the chair at the pharmacy.  She made me
24  aware that she had fallen.  I went and got her a
25  statement.  She told me where she fell.  I

29

1  isolated the area while she was filling out her
2  report and came back to her.
3      Q.    I'm going to show you what has been
4  marked as Plaintiff's Exhibit 2 for
5  identification.
6          Have you ever seen that prior to
7  today?
8      A.    That's my signature.
9      Q.    That's your signature?
10      A.    My signature on her report.  I would
11  take this report and go to the computer and fill
12  this out.
13      Q.    So, the Plaintiff's Exhibit 2 would
14  have been generated first before you filled out
15  your report?
16      A.    I must have her information to put it
17  into the system.
18      Q.    Okay.  Did she tell you where she had
19  her slip and fall?
20      A.    Yes.
21      Q.    Where did she have her slip and fall?
22      A.    In HBA, about 12 feet from the
23  pharmacy.
24      Q.    What is HBA?
25      A.    Health and beauty aids.

8 (Pages 26 to 29)

30

1    Q.   What type of products did they sell
2  at the health and beauty aids?
3    A.   Okay.  We sell shampoo, conditioners,
4  powder.  We sell soap.  We sell deodorant.
5    Q.   Do you sell baby oil?
6    A.   Baby oil is there.
7    Q.   Do you recall what type of baby oil
8  you sold back in 2005?
9    A.   I can't remember 2005 completely, but
10 it had to be Equate and J&J, Johnson and Johnson's
11 baby oil.  There are two I am sure we sold,
12 because we still sell them.
13   Q.   Did you personally make an
14 observation of the area where she fell?
15   A.   Yes.
16   Q.   Did you see baby oil on the floor?
17   A.   It was difficult to see.  It was
18 clear, but I did find it eventually.  She said and
19 told me where it was.  I put the cones up, called
20 someone over to clean it up.  It was very
21 difficult because it was clear.
22   Q.   In the health and beauty aid aisle?
23   A.   I forgot hair dye.
24   Q.   What do you mean by that?
25   A.   We have a whole aisle of hair dye in

31

1  HBA, two sides.  Men's and women's.
2    Q.   How high are the shelves in that
3  area?  How high off the floor?
4    A.   Is your question how high is the top
5  shelf from the floor?
6    Q.   If I'm standing there, exactly from
7  the bottom to the top of the shelf, is it
8  four feet?  Five feet?  Six feet?
9    A.   I would have to say, approximately,
10 five and a half feet.
11   Q.   How many shelves are there?  Is there
12 a shelf of one foot?  Maybe five shelves?
13   A.   Depends on the product displayed on
14 the shelves.
15   Q.   Do you recall where baby oil was
16 displayed on the shelves back then?
17       Closer to the ground floor or closer
18 to the top of the shelf?
19   A.   I would say eye level for myself and
20 I'm five-three.
21   Q.   Would this be fair to say, this is
22 the fair only statement you have from Carolyn
23 Balsamides concerning her accident on March 17th,
24 2005?
25   A.   Yes.

32

1    Q.   Is this the only report you generated
2  concerning the slip and fall, March 17th, 2005;
3  what I'm referring to is Plaintiff's Exhibit 1 for
4  identification?
5    A.   Yes.
6    Q.   To the best of your knowledge, are
7  there any other reports that reference Carolyn
8  Basamides' report from March 17th, 2005?
9    A.   Not that I remember or have seen.
10   Q.   To the best of your knowledge or
11 recollection, do you know if any Wal-Mart employee
12 specifically saw Carolyn Basamides fall
13 March 17th, 2005?
14   A.   No.
15   Q.   Now, you said she was sitting in the
16 chair by the pharmacy?
17   A.   Yes.
18   Q.   What happened after that?
19   A.   After I took my report?
20   Q.   Yes.
21   A.   She said she was going to take her
22 aunt home and she left.
23   Q.   She walked out of the store?
24   A.   Yes.
25   Q.   When you were talking to her, did she

33

1  make any -- strike that.
2        When you were speaking with her, did
3  she have any complaints of injury?
4    A.   She said she hurt her ankle, her
5  knees.  Basically what she wrote on her report.
6    Q.   You are referring to Plaintiff's
7  Exhibit 2 for identification?
8    A.   Yes.
9    Q.   She was able to walk out of the
10 store?
11   A.   Yes.
12   Q.   Did you make any personal observation
13 of her walking out the store?
14   A.   No.  I can't tell you I watched her
15 walk out because I did not.
16   Q.   Do you know the name of the employee
17 that cleaned up the spill where Carolyn fell?
18   A.   No.
19   Q.   Would that -- who would have cleaned
20 up the spill, a maintenance worker?  A sales
21 employee?
22   A.   It would have been whoever got there
23 first.  I called on the radio and said get over
24 here, we have a small spill at the end of the HBA
25 aisle.

9 (Pages 30 to 33)

34

1      Q.   Would it have been a maintenance
2  worker or someone else?
3      A.   It was probably the girl in HBA.
4      Q.   Back in March of 2005, there wasn't a
5  say, specific maintenance worker on call to come
6  out and clean up spills?
7      A.   There would be, but a sales associate
8  was probably closer.  I was with her, but somebody
9  did get over there to clean it.
10     Q.   Did you make observations who did
11 clean it?
12     A.   No.  I was talking to the customer.
13     MR. LEIGHT:  Thank you for your time.
14 I have no further questions.
15          (Whereupon, the witness was
16     excused and the proceeding was concluded
17     at 10:50 a.m.)
18
19
20
21
22
23
24
25

35

C E R T I F I C A T E
- - - - - - - - - - - -

I, LORI NOEL LEWKOWITZ, a Certified Court
Reporter of the State of New Jersey certify that
prior to the commencement of the examination of
JACQUELINE PERUN was duly sworn by me.

I DO FURTHER CERTIFY that the following
Deposition is a true and accurate transcript of
the proceedings as taken stenographically by me at
the place, time and date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a
relative, nor employee, nor attorney or counsel to
any parties involved; that I am neither related to
any of the parties to this action by blood or by
marriage, and that I am not financially interested
in this matter.

- - - - - - - - - - - - - - - - - - - - - - - - - -
LORI NOEL LEWKOWITZ, C.C.R.
N.J. C.C.R. No.: XI02229

10 (Pages 34 to 35)

Priority-One Court Reporting Services, Inc.
25B Vreeland Road, Suite 301, Florham Park, NJ 07932                    718-983-1234